RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0502p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOSEPH P. SIMCOX,

        *Plaintiff-Appellee,*

   *v.*

        No. 07-3911

CLAIRE M. SIMCOX,

        *Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 07-00096—Christopher A. Boyko, District Judge.

Argued: October 26, 2007

Decided and Filed: December 28, 2007

Before: BOGGS, Chief Judge; KENNEDY, Circuit Judge; and JORDAN, District Judge.[*]

---

### COUNSEL

**ARGUED:** Alan N. Hirth, MEYERS, ROMAN, FRIEDBERG & LEWIS, Cleveland, Ohio, for Appellant. Maryanne Stanganelli, BAKER & HOSTETLER, New York, New York, for Appellee. **ON BRIEF:** Alan N. Hirth, Debra J. Horn, Kennee B. Switzer, MEYERS, ROMAN, FRIEDBERG & LEWIS, Cleveland, Ohio, for Appellant. Maryanne Stanganelli, John J. Carney, BAKER & HOSTETLER, New York, New York, for Appellee. Michael D. Napoli, KIRKPATRICK & LOCKHART PRESTON GATES ELLIS, Dallas, Texas, Kathleen B. Havener, HAHN, LOESER & PARKS, Cleveland, Ohio, for Amici Curiae.

---

### OPINION

---

    BOGGS, Chief Judge. Claire Simcox appeals from the decision of the district court ordering her to return to Mexico with two of the four children currently residing with her in Ohio, which return the district court found was required under the Hague Convention on Civil Aspects of International Child Abduction ("the Convention") and its implementing legislation, the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 *et seq.* Because of evidence of serious abuse to both Mrs. Simcox and the children at the hands of Mr. Simcox, the district court

---

[*]The Honorable R. Leon Jordan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

1

conditioned return of the children on certain "undertakings" designed to ameliorate the risk of harm to them upon their return to Mexico. Although we agree with much of the district court's legal analysis of the Hague Convention, its ordered undertakings are problematic on the facts of this case, particularly its command that Mrs. Simcox herself return to Mexico. We therefore REVERSE and REMAND to allow the court to reconsider what conditions, if any, could ensure the safety of the children in Mexico during the pendency of custody proceedings.

## I. Background

Joseph and Claire Simcox, both United States citizens, were married in London in 1991. They traveled extensively throughout their marriage and moved frequently, visiting approximately 45 countries. Mr. Simcox is a botanical explorer by trade—he collects and sells exotic plant seeds. Mrs. Simcox assisted him in this business and also cared for the couple's five children, each of whom was born in a different country. Mrs. Simcox maintains that the family had no real home and lived "a nomadic and isolated existence." Appellant's Br. at 5. Nevertheless, it appears that—apart from some temporary sojourns abroad—they resided in Mexico since at least the birth of their youngest child there in 2002. Mrs. Simcox nevertheless points out that they lived in three different states in Mexico and continued to travel abroad extensively. The last place of residence for the family was the town of Rafael Delgado in the state of Veracruz. Mrs. Simcox characterized their residence in Rafael Delgado as a "flophouse," but the oldest child, who still resides there with her father, testified that it is "a lovely house" that "we all considered home."

The parties paint a starkly different picture of what family life in Mexico was like. Mr. Simcox describes the children's lives as blissful, filled with exotic travel and wondrous educational and cultural opportunities. Appellee's Br. at 8-9. Mrs. Simcox, on the other hand, claims that the children's lives were "filled with hard labor, severe physical punishment, exposure to [Mr. Simcox]'s humiliations and violent behavior[,] and long weeks of travel confined to a car." Appellant's Br. at 7. The district court expressed frustration at the "lack of credibility of both [parties]" and noted that the "disparities [in their testimonies are] so broad this Court can only speculate on the truth." Nevertheless, although there was no clear picture of exactly what life was like in the Simcox household prior to the alleged wrongful abduction, it is clear that Mr. Simcox was both verbally and physically violent with his wife and children. For example, the oldest child testified that he would call Mrs. Simcox a "f---ing bitch [and] a c---" in the presence of the children, and that "[h]e would maybe grab her jaw and put his finger on her neck, pulling hair." She also stated that her father once while driving banged her mother's head against the passenger window of the vehicle in which they were traveling, and that she often had to intervene by placing herself between them. The other children (with the exception of the youngest, who did not testify) expressed fear of their father and recounted frequent episodes of belt-whipping, spanking, hitting, yelling and screaming, and of pulling their hair and ears. They also witnessed their father strike their mother on numerous occasions. For example, C. Simcox, testifying *in camera*, recalled an incident in which her father "held [her mother] by the neck against the wall. [Her older sister] tried to stop him but he hit her." Mr. Simcox himself acknowledges that he would "physically discipline" his children, but downplays the seriousness of this "discipline." Appellee's Br. at 12, 31.

While there is no dispute that Mr. Simcox is an ill-tempered and oft-times violent man, it is unclear precisely how grave the abuse in the Simcox household actually was. Mrs. Simcox admits that she never sought medical attention following the assaults, either for her own injuries or for those of her children, and she never reported the abuse to any government officials until the weeks immediately prior to her flight from Mexico, when she contacted the American consulate. There was also some evidence that Mrs. Simcox may have left Mexico not (or, at least, not only) to escape Mr. Simcox's abuse, but to be closer to another man with whom she had become romantically involved.

Ultimately, whether to escape her husband's increasingly violent abuse (as Mrs. Simcox claims), or to be with her adulterous lover (as Mr. Simcox claims), or perhaps some combination of the two motivations, Mrs. Simcox decided to leave Mexico with the children and live with her family in Ohio. During early January 2006, while temporarily in Ohio with her family, Mrs. Simcox began to make arrangements to leave Mexico with the children. She contacted some individuals at the United States consulate in Mexico City and at the Center for Domestic Violence in Cleveland, and also spoke to several attorneys. On the night of January 31, 2006, after Mr. Simcox had fallen asleep, Mrs. Simcox instructed the four younger children to pack their bags and then left with them in the family car, driving to the Texas border. Mr. Simcox testified that his wife took his passport and identification papers with her to prevent his pursuit of the fleeing family. The oldest child was living with Mrs. Simcox's mother in France at the time, and Mrs. Simcox apparently made no arrangements to reunite with her. She was picked up by her father in France in early February, and returned to live with him in Rafael Delgado, Mexico, where she remains.[1]

Mr. Simcox filed this petition seeking return of the children to Mexico on January 12, 2007, nearly one year after the abduction. Preliminarily, the district court concluded that Mr. Simcox had established, by a preponderance of the evidence, that the children were wrongfully removed from Mexico—the country of "habitual residence" within the meaning of the Hague Convention—and thus the burden shifted to Mrs. Simcox to prove one of the defenses against return permitted under Article 13. *Simcox v. Simcox*, 499 F. Supp. 2d 946, 950-52 (N.D. Ohio 2007). The court noted that the Convention authorizes a court to decline to order the return of a child who objects to such return, if the child is of sufficient age and maturity to consider its views. *Id.* at 952. The court found that the two older children "possessed the requisite level of age and maturity sufficient for this Court to consider their views," noted their "unequivocal[] . . . objections to return[ing] to Mexico," and thus declined to order their return. *Ibid.* Although the district court also noted that the second-youngest child ("D. Simcox," then age eight) had "expressed his objections to return," the court did not find him of sufficient age and maturity to take his views into consideration. *Ibid.* Similarly, at four years of age, the youngest child "was not of sufficient age and maturity for this Court to consider interviewing her." *Ibid.* The court thus moved on to analyzing whether the return of the two younger children would pose a "grave risk of physical or psychological harm" to them or would otherwise "place [them] in an intolerable situation" under Article 13b of the Convention. *Id.* at 950, 953 (citing 42 U.S.C. § 11603(e)(2)(A)).

Before doing so, however, the district court paused to express its disdain for Mr. Simcox's behavior throughout the proceedings, describing his deposition testimony as "unresponsive, obnoxious, intentionally obtuse and arrogant. His own counsel had to repeatedly admonish [him] to stop being argumentative." *Id.* at 952. The court stated that, at trial, Mr. Simcox "became belligerent" and "fail[ed] to follow repeated instructions by Court and counsel to answer only the questions put him by counsel and to refrain from . . . monologuing on simple yes and no questions . . . ." *Id.* at 953. The court further noted that Mr. Simcox's

> in-court behavior exhibits an arrogance, a need to be in control and a tendency to act out violently that presents serious concerns such traits have been amplified outside the confines of the courthouse. When coupled with testimony from [Mr. Simcox]'s own family and friends describing him as "mean," and one friend comparing Mr. Simcox's control over his wife with the Nazi's treatment of Jews . . . and [Mr. Simcox]'s own desire not to be remembered as "a mean and overworking hollering bastard," this Court has serious concerns [Mr. Simcox] does indeed present a serious threat to his children's physical and psychological well-being.

---

[1] At oral argument, counsel for Mr. Simcox reported that both he and his daughter are not presently in Mexico, but are again traveling abroad.

*Ibid.* Nevertheless, although concluding that Mrs. Simcox "ha[d] provided evidence of a *serious* risk of harm due to abuse and emotional dependence," the court noted that it could "only consider that evidence 'directly establishing the existence of a *grave* risk that would expose the child to physical or emotional harm or otherwise place the child in an *intolerable* situation." *Id.* at 954 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996) ("*Friedrich II*")). The court concluded that the threshold of a "grave risk" was not met. *Ibid.*

Finally, the court rejected Mrs. Simcox's argument that Mr. Simcox had either consented or acquiesced to the removal of the children. *Id.* at 956-57. Mrs. Simcox's strongest piece of evidence for consent was an e-mail Mr. Simcox sent to her when she was in Ohio in the weeks *prior* to her flight with the children. In the e-mail, Mr. Simcox states:

> THERE IS NO REASON FOR YOU TO COME BACK HERE! I will arrange for the kids to join you when you have a place to stay. . . . PLEASE DO NOT COME BACK, ask your Dad to help you find an apartment, as soon as you are ready I will bring up the kids. I am resolved to leaving them with you until should it happen that they are big enough and decide they want to live with me.

The district court, however, noted Mrs. Simcox's "deliberately secretive nature" in leaving Mexico with the children and found that "[n]either party acted consistent with the understanding [that Mr. Simcox] had consented to removal of the children." *Id.* at 956 (citing *Friedrich II*, 78 F.3d at 1069).

The court ultimately concluded that Mrs. Simcox "has not met her burden of demonstrating a valid defense to the return of [the two youngest children] and the Court orders their return to Mexico for determination of custody by the Mexican courts." *Id.* at 957. The court did, however, condition the return on several "undertakings":

> [D]ue to this Court's concern over the children's safety, the Court Orders return under the following conditions: . . . the Court orders [the two youngest children] returned to Mexico but [they] must remain in the custody of [Mrs. Simcox] in the family's residence in Rafael Del Gado, Mexico until the Mexican Court hears and determines whether a protective order is appropriate. [Mr. Simcox] shall have no contact with [Mrs. Simcox] until the Mexican Court determines access and visitation rights. Upon return to Mexico, [Mrs. Simcox] shall provide [the oldest child] reasonable access to her siblings.

*Ibid.* The court issued its order on June 27, 2007.

Mrs. Simcox moved to stay the district court's order pending appeal, asserting that Mr. Simcox had subsequently threatened to have her arrested and prosecuted upon her return to Mexico. Mr. Simcox—apparently exulting in his partial victory in district court—called Mrs. Simcox's attorneys and stated in voice-mail messages that Mrs. Simcox would be immediately incarcerated upon her return to Mexico. Mr. Simcox made a similar threat to Mrs. Simcox directly by interrupting a mid-July speakerphone conversation between the oldest child and her siblings. Nevertheless, the district court rejected this as a legitimate basis for staying its order pending appeal. ("Whether [Mrs. Simcox] has committed a crime under Mexican law is no basis to stay return."). This court granted a stay of the district court's order pending expedited appeal, citing the evidence of physical abuse, Mr. Simcox's threats to subject Mrs. Simcox to criminal prosecution, and the nearly year-long delay between the time of the alleged abduction and Mr. Simcox's filing a petition for return.

## II. Analysis

In a case involving an action for return of a child under the Hague Convention, this court "review[s] the district court's findings of fact for clear error and review[s] its conclusions about American, foreign, and international law *de novo*." *Friedrich II*, 78 F.3d at 1064. Whether there is a "grave risk" of harm under the Convention is a mixed question of law and fact and thus review is *de novo*. *See Silverman v. Silverman*, 338 F.3d 886, 896 (8th Cir. 2003); *Blondin v. Dubois*, 238 F.3d 153, 158 (2d Cir. 2001) ("The District Court's application of the Convention to the facts it has found, like the interpretation of the Convention, is subject to *de novo* review.").

On appeal, Mrs. Simcox raises five arguments: (1) the district court erred in holding that Mexico was the children's place of habitual residence prior to their removal; (2) the district court misinterpreted Article 13b of the Convention, which permits a court to decline to order return if such return would present a "grave risk" of harm to the children; (3) the district court erred in adopting undertakings that required Mrs. Simcox herself to return to Mexico and that did not sufficiently ameliorate the risk of harm to the children; (4) the district court erred in holding that Mr. Simcox had not consented to the removal of the children; and (5) the district court erred in determining that D. Simcox was not of sufficient age and maturity to consider his objection to being returned to Mexico. We dispense first with issues one, four, and five, and affirm the district court's judgment as to those issues. We then deal with issues two and three, which are substantially intertwined, and remand to the district court for further proceedings.

### A. Habitual Residence

The Hague Convention prohibits the removal of a child, in breach of the rights of custody, from "the State in which the child was habitually resident immediately before the removal . . . ." Hague Convention, Article 3. "Habitual residence" is not defined by the Convention, but as this court has noted, "there is no real distinction between ordinary residence and habitual residence." *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) ("*Friedrich I*"). "A person can have only one habitual residence. On its face, habitual residence pertains to customary residence prior to the removal. The court must look back in time, not forward." *Ibid.* In answering the question of habitual residency, a court should consider whether the child has been "physically present [in the country] for an amount of time sufficient for acclimatization" and whether the place "has a 'degree of settled purpose' from the child's perspective." *Robert v. Tesson*, --- F.3d ---, 2007 WL 3354019 at *6 (6th Cir. Nov. 14, 2007) (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)).[2] The petitioning party (in this case, Mr. Simcox) has the burden of showing by a preponderance of the evidence that the removal was wrongful under the Convention. *See* 42 U.S.C. § 11603(e)(1); *Friedrich I*, 983 F.2d at 1400.

*Friedrich* is directly on point here. The case involved a boy born in Germany to an American mother and a German father; aside from a few vacations, he had resided in Germany his entire life (twenty months) until removed to the United States by his mother. *See Friedrich I*, 983 F.2d at 1398-99, 1401. We concluded that *Friedrich* was "a simple case" and held that the child "was a habitual resident of Germany at the time of his removal." *Id.* at 1402. Similarly, in this case, the youngest Simcox child was born in Mexico and resided there her entire life (other than for some temporary sojourns abroad). The second-youngest, who was about seven years old at the time of removal, appears to have lived there since the age of four. As Mrs. Simcox concedes, the entire family "stayed in Mexico" since at least 2002. Appellant's Br. at 5. That they may have moved around to different communities within Mexico, had a "nomadic lifestyle," or often traveled

---

[2]Of course, this standard may not be appropriate in cases involving infants or other very young children. *See, e.g.*, *Friedrich I*, 983 F.2d at 1401-02.

internationally, does not change the fact that Mexico was the country in which the family principally resided during the period in question. The district court credited evidence that Mr. Simcox presented regarding leases of real property in Mexico, utility bills, frequent withdrawals on accounts in Mexican banks, membership cards to various stores in Mexico, and Mrs. Simcox's own testimony in concluding that Mr. Simcox had met his burden of demonstrating, by a preponderance of the evidence, that the family's place of habitual residence was Mexico. *Simcox*, 499 F. Supp. 2d at 951. The district court did not err in so finding.

### B.  Consent to Removal

Article 13a of the Convention provides a consent defense where the petitioner "consented to or subsequently acquiesced in the removal or retention." Hague Convention, Article 13a. The respondent has the burden of establishing the defense by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B). Mrs. Simcox points to the e-mail message her husband sent her while she was in Ohio during the early weeks of January 2006 as illustrating that he consented to the removal. Appellant's Br. at 31. She states that while her "departure may have been precipitous, . . . [t]here was never a time that [Mr. Simcox] did not know where to find the children." *Ibid.* But even if Mr. Simcox knew where the children were (which he disputes), it does not necessarily follow that Mrs. Simcox had his consent to remove them from Mexico. Indeed, the e-mail message that Mrs. Simcox points to as her most damning piece of evidence would seem to argue *against* a finding of consent. In the message, after admonishing his wife to remain in Ohio, Mr. Simcox states, "I will *arrange for the kids to join you* when you have a place to stay," and that "as soon as you are ready *I will bring up the kids*." (emphasis added). The implication is that the children were to remain in Mr. Simcox's custody until some unspecified future point when he would deliver them to their mother in the United States—not that Mrs. Simcox could return to Mexico and surreptitiously retrieve them.

Moreover, regardless of the proper interpretation of the e-mail message, as we pointed out in *Friedrich II*, "[e]ach of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights." 78 F.3d at 1070. Although we were speaking specifically about post-abduction acquiescence, the logic applies also to pre-abduction consent. That is to say, a single e-mail message indicating a willingness to allow the children to live with their mother in Ohio should not be the basis for a finding that Mr. Simcox consented to their removal, especially given the manner in which Mrs. Simcox removed the children. As this court has stated, the "deliberately secretive nature of [the] actions [of the removing parent] is extremely strong evidence that [the other parent] would not have consented to the removal . . . ." *Friedrich II, id.* at 1069. Mrs. Simcox admits that she left with the children at midnight after her husband had fallen asleep. *Simcox*, 499 F. Supp. 2d at 956. The district court credited Mr. Simcox's testimony that his wife had taken his passport and identification papers to prevent his pursuit of the fleeing family, and that once he realized they were gone he engaged in a "desperate search" for the children. *Ibid.* Thus, the district court properly found that "[n]either party acted consistent with the understanding [that Mr. Simcox had] consented to removal of the children," and that Mrs. Simcox had therefore failed to establish the defense. *Ibid.*

### C.  "Age and Maturity" Exception

Mrs. Simcox argues that the district court erred in not taking into consideration D. Simcox's objection to returning to Mexico because it deemed him too immature. Appellant's Br. at 32. Article 13 of the Hague Convention authorizes a court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." The *respondent* has the burden of establishing this by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B). Whether a child is mature enough to have its views considered is a factual finding, and as such, the district court is entitled to deference. *See Friedrich II*, 78 F.3d at 1064 (findings of fact are reviewed for clear error).

In this case, the court interviewed D. Simcox *in camera* and found him to be "preoccupied, disinterested and detached; in short, a typical eight year old boy who strongly desired to be anywhere but in a Judge's chambers answering questions." *Simcox*, 499 F. Supp. 2d at 952. Although the district court noted the child's "avoidance in discussing his father" and stated that he "was visibly uncomfortable dealing with memories of Mexico," the court concluded that he was "not of sufficient age and maturity to permit this Court to appropriately consider his views." *Ibid.*

Mrs. Simcox points out that other courts have found children of a similar age to be sufficiently mature. Appellant's Br. at 32. But "[g]iven the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate." *De Silva v. Pitts*, 481 F.3d 1279, 1287 (10th Cir. 2007). Simply because other eight-year-olds have been found to be sufficiently mature does not mean that the district court erred in not finding the same with regard to D. Simcox. The district court was obviously in a much better position to judge the child's maturity than are we. Because the court's factual determination that D. Simcox was not sufficiently mature to take his views into consideration was not clearly erroneous, there is no ground for reversal.

### D. Article 13b and the District Court's Undertakings

Under Article 13b of the Hague Convention, a court "is not bound to order the return of the child if . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." The burden is with the respondent to demonstrate "by clear and convincing evidence" that the exception applies. 42 U.S.C. § 11603(e)(2)(A). The "grave risk" exception is to be interpreted narrowly, lest it swallow the rule. *See Friedrich II*, 78 F.3d at 1067. That rule—that "[c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned," 42 U.S.C. § 11601(a)(4)—was designed to protect the interests of the state of habitual residence in determining any custody dispute, and to deter parents from unilaterally removing children in search of a more sympathetic forum. *See Friedrich II*, 78 F.3d at 1064; Linda Silberman, *Hague Convention on International Child Abduction: A Brief Overview and Case Law Analysis*, 28 FAM. L. Q. 9, 11 (1994). These purposes, however, must "give[] way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation." Elisa Perez-Vera, Explanatory Report ¶ 29, in 3 *Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction* 1069 (1982) ("Perez-Vera Report").[3] It thus makes sense that "the Convention's purposes [would] not . . . be furthered by forcing the return of children who were the direct or indirect victims of domestic violence." Merle H. Weiner, *Navigating the Road Between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction*, 33 COLUM. HUMAN RIGHTS L. REV. 275, 352-53 (2002).

Thus, while all jurists would agree that *some* level of domestic abuse will trigger the Article 13b exception, the more difficult question is at precisely what level will return expose the child to a "*grave* risk" of harm or place the child in an "*intolerable* situation"? There is no clear answer, though this court has favorably cited a State Department report that states, "The person opposing the child's return must show that the risk to the child is grave, not merely serious." *Friedrich II*, 78 F.3d at 1068 (citing Public Notice 957, 51 Fed. Reg. 10494, 10510 (March 26, 1986)); *see also Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000) ("[T]he harm must be a great deal more than

---

[3]The Perez-Vera Report is the official commentary to the Hague Convention. *See* Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,503 (Mar. 26, 1986) ("[Professor Perez-Vera's] explanatory report is recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it.").

minimal."). The same report also noted that "[a]n example of an 'intolerable situation' is one in which a custodial parent sexually abuses the child" because such circumstances would constitute "a grave risk of psychological harm." *Friedrich II*, 78 F.3d at 1069.

In *Friedrich II*, we determined that "adjustment problems that would attend the relocation of most children," which was all that Mrs. Friedrich had alleged, did not meet the grave risk exception. *Id.* at 1067. The case did not involve any allegations of abuse, however, and courts that have confronted abusive situations tend to refuse to order the return of the children, at least where the abuse could be characterized as very serious. *See, e.g.*, *Van de Sande v. Van de Sande*, 431 F.3d 567, 570 (7th Cir. 2005) (reversing order of return where the father had "beat[en] his wife severely and repeatedly in [the children's] presence," and also threatened to kill them); *Walsh*, 221 F.3d at 219-20 (reversing order of return where father was psychologically abusive and had severely beaten the children's mother in their presence); *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 398-400 (E.D.N.Y. 2005) (refusing return where father frequently hit the children, threatened to kill his son, and severely abused their mother in their presence); *Rodriguez v. Rodriguez*, 33 F. Supp. 2d 456, 459-60 (D. Md. 1999) (refusing return where child had been belt-whipped, punched, and kicked, and where the child's mother had been subjected to more serious attacks, including choking her and breaking her nose).

Nevertheless, even when confronted with a grave risk of harm, some courts have exercised the discretion given by the Convention to nevertheless "return [the] child to the country of habitual residence, provided sufficient protection was afforded." *Walsh*, 221 F.3d at 221. That protection may take the form of "undertakings," or enforceable conditions of return designed to mitigate the risk of harm occasioned by the child's repatriation. *See Feder*, 63 F.3d at 226 ("[I]n order to ameliorate any short-term harm to the child, courts in the appropriate circumstances have made return contingent upon 'undertakings' from the petitioning parent."); *Baran v. Beaty*, 479 F. Supp. 2d 1257, 1272 (S.D. Ala. 2007).[4] The determination of whether any valid undertakings are possible in a particular case is "inherently fact-bound" and the petitioner proffering the undertaking bears the burden of proof. *Danaipour*, 286 F.3d at 21, 26; *see also Baran*, 479 F. Supp. 2d at 1272 ("[W]hether any valid undertakings are possible in a particular case . . . is an issue on which the petitioner bears the burden of proof." (citing *Danaipour*, 286 F.3d at 21)).

Many courts and commentators have advocated the use of undertakings in order to "accommodate [both] the interest in the child's welfare [and] the interests of the country of the child's habitual residence." *Van de Sande*, 431 F.3d at 571-72; *see also Danaipour*, 286 F.3d at 21 ("A potential grave risk of harm can, at times, be mitigated sufficiently by the acceptance of undertakings and sufficient guarantees of performance of those undertakings."); Silberman, 28 FAM. L. Q. 9, 32-33 (advocating the use of undertakings). The same courts, however, have viewed undertakings much more skeptically in cases involving an abusive spouse. *See Van de Sande*, 431 F.3d at 572 ("[I]n cases of abuse, the balance may shift against [undertakings]."); *Danaipour*, 286 F.3d at 26 ("Where substantial allegations are made and a credible threat exists, a court should be particularly wary about using potentially unenforceable undertakings to try to protect the child."); *see also Baran*, 479 F. Supp. 2d at 1273 (declining to adopt undertakings where there was "abundant, credible evidence before the Court that [petitioner] is a violent and abusive man . . . ."). A particular problem with undertakings—especially in situations involving domestic violence—is the difficulty of their enforcement. *See Danaipour*, 286 F.3d at 23 (expressing "serious concerns about whether undertakings or safe harbor orders that go beyond the conditions of return are enforceable in the home country"); Merle H. Weiner, *International Child Abduction and the Escape*

---

[4]While discretion for undertakings is implicit in the optional nature of Article 13, "[t]he concept of 'undertakings' is based neither in the Convention nor in the implementing legislation of any nation. . . . Rather, it is a judicial construct, developed in the context of British family law." *Danaipour v. McLarey*, 286 F.3d 1, 21 (1st Cir. 2002) (citation omitted).

*from Domestic Violence*, 69 FORDHAM L. REV. 593, 678 (2000) ("[T]here is currently no remedy for the violation of an undertaking. Contrary statements by some courts are simply wrong."); Paul R. Beaumont & Peter B. McEleavy, THE HAGUE CONVENTION ON INTERNATIONAL CHILD ABDUCTION 165 (1999) ("[I]f one of the Article 12 or 13 exceptions is applicable the court should not exercise its discretion to return the child unless enforcement of the undertakings can be guaranteed."). Clearly, then, undertakings are not appropriate in all cases, and a court "must recognize the limits on its authority and must focus on the particular situation of the child in question in order to determine if the undertakings will suffice to protect the child." *Danaipour*, 286 F.3d at 21.

The State Department, whose comments are frequently cited in case law and are "accord[ed] great weight," *id.* at 22, has offered guidance on the proper use of undertakings. *See also Blondin*, 238 F.3d at 162 n.10 ("[T]he meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."). The State Department recommends that

> undertakings should be limited in scope and further the Convention's goal of ensuring the prompt return of the child to the jurisdiction of habitual residence, so that the jurisdiction can resolve the custody dispute. Undertakings that do more than this would appear questionable under the Convention, particularly when they address in great detail issues of custody, visitation, and maintenance.

*Danaipour*, 286 F.3d at 22 (citing Letter from Catherine W. Brown, Assistant Legal Adviser for Consular Affairs, United States Dep't of State, to Michael Nicholls, Lord Chancellor's Dep't, Child Abduction Unit, United Kingdom (Aug. 10, 1995), *at* http://www.hiltonhouse.com/articles/Undertaking_Rpt.txt). The report goes on to assert,

> If the . . . court is presented with unequivocal evidence that return would cause the child a "grave risk" of physical or psychological harm, however, then it would seem less appropriate for the court to enter extensive undertakings than to deny the return request. The development of extensive undertakings in such a context could embroil the court in the merits of the underlying custody issues and would tend to dilute the force of the Article 13(b) exception.

*Id.* at 25. In examining this official guidance, courts have concluded that "undertakings are most effective when the goal is to preserve the status quo of the parties prior to the wrongful removal. This, of course, is not the goal in cases where there is evidence that the status quo was abusive." *Van de Sande*, 431 F.3d at 572 (quoting *Danaipour*, 286 F.3d at 25).

As the government of Mexico pointed out in its amicus brief before this court, in considering whether a "grave risk" exists and whether any undertakings can ameliorate it, a court should primarily focus on the time period between repatriation and the determination of custody by the courts in the child's homeland. We acknowledge that other circuits have stated that "[t]he Convention does not require that the risk be 'immediate'[,] only that it be grave," *Walsh*, 221 F.3d at 218, and that "[u]ndertakings that will protect the child from grave risk for only a very limited time are insufficient to defeat an Article 13(b) claim," *Danaipour*, 286 F.3d at 26, but we do not believe that these statements should be interpreted as an invitation for a court to engage in an open-ended "grave risk" analysis. That is, an inquiry that focuses on too lengthy a period of time runs the risk of turning into a "child's best interests" analysis, which is not the proper standard under the Convention. *See* Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986) (noting that the Article 13b defense may not be used "as a vehicle to litigate (or relitigate) the child's best interests"); *see also Friedrich II*, 78 F.3d at 1068 ("The exception for grave harm to the child is not license for a court in the abducted-to country to

speculate on where the child would be happiest. That decision is a custody matter, and reserved to the court in the country of habitual residence.").

In considering these authorities, we believe that Hague Convention cases dealing with abusive situations can be placed into three broad categories. First, there are cases in which the abuse is relatively minor. In such cases it is unlikely that the risk of harm caused by return of the child will rise to the level of a "*grave* risk" or otherwise place the child in an "*intolerable* situation" under Article 13b. In these cases, undertakings designed to protect the child are largely irrelevant; since the Article 13b threshold has not been met, the court has no discretion to refuse to order return, with or without undertakings.[5] Second, at the other end of the spectrum, there are cases in which the risk of harm is clearly grave, such as where there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect. *See, e.g.*, *Van de Sande*, 431 F.3d at 571; *Walsh*, 221 F.3d at 220 (both rejecting undertakings in the face of such evidence). In these cases, undertakings will likely be insufficient to ameliorate the risk of harm, given the difficulty of enforcement and the likelihood that a serially abusive petitioner will not be deterred by a foreign court's orders. Consequently, unless "the rendering court [can] satisfy itself that the children will in fact, and not just in legal theory, be protected if returned to their abuser's custody," *Van de Sande*, 431 F.3d at 570, the court should refuse to grant the petition. Third, there are those cases that fall somewhere in the middle, where the abuse is substantially more than minor, but is less obviously intolerable. Whether, in these cases, the return of the child would subject it to a "grave risk" of harm or otherwise place it in an "intolerable situation" is a fact-intensive inquiry that depends on careful consideration of several factors, including the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return. Even in this middle category, undertakings should be adopted only where the court satisfies itself that the parties are likely to obey them. Thus, undertakings would be particularly inappropriate, for example, in cases where the petitioner has a history of ignoring court orders. *See Walsh*, 221 F.3d at 220-21 (citing the petitioner's "history of violating [court] orders" in concluding that undertakings would be insufficient to protect the children). Where a grave risk of harm has been established, ordering return with feckless undertakings is worse than not ordering it at all.

We pause to note that, although the "grave risk" threshold is necessarily a high one, there is a danger of making the threshold so insurmountable that district courts will be unable to exercise any discretion in all but the most egregious cases of abuse. Absent a grave risk finding, the Convention leaves no room for a court to establish, as the district court did in this case, ameliorative undertakings designed to protect children against the risk of harm upon their return. *See* Hague Convention, Article 13b (noting that a court is "not bound to order the return of the child" only if the exception applies). Once the district court determines that the grave risk threshold is met, only then is the court vested by the Convention with the *discretion* to refuse to order return. It is with this discretion that the court may then craft appropriate undertakings. Given the intensely fact-bound nature of the inquiry, district courts should be allowed adequate discretion. *See Van de Sande*, 431 F.3d at 572 (noting that although the "grave risk" defense should be interpreted narrowly, "the safety of children is paramount").

In applying the above framework to the present case, we believe that it fits in the middle category. The nature of abuse here was both physical (repeated beatings, hair pulling, ear pulling, and belt-whipping) and psychological (Mr. Simcox's profane outbursts and abuse of the children's

---

[5]We do not mean to suggest, however, that a court is powerless to deal with ordinary logistical considerations that frequently accompany the return of any child, such as deciding which parent will pay for the child's return airfare. Although these have sometimes been referred to as "undertakings," *see, e.g.*, *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1366 (M.D. Fla. 2002), we are speaking specifically of those conditions on return designed to ameliorate the risk of harm in the context of abusive situations.

mother in their presence).  Importantly, these were not isolated or sporadic incidents.  A psychologist who examined the children presently in Mrs. Simcox's custody found that all but the youngest were suffering from some level of post-traumatic stress disorder.[6]  Such psychological trauma could be exacerbated if D. Simcox is returned to Mexico and comes again into contact with his father.  Although S. Simcox, presumably due to her young age, appears to have largely escaped the physical and psychological injuries suffered by her older siblings, nothing in the Convention requires that a child must first be traumatized by abuse before the Article 13b exception applies.  *See Elyashiv*, 353 F. Supp. 2d at 409 (citing "the likelihood of future abuse" in refusing to return a child to her father, even though she, unlike her two older siblings, had not experienced physical abuse and was not suffering from post-traumatic stress disorder).  The abuse in this case is somewhat less serious than the abuse in which other courts have refused to order return.  *See Van de Sande*, *Walsh*, *Elyashiv*, and *Rodriguez*, cited *supra*.  But is it also decidedly *more* serious than the abuse in those cases, cited by Mr. Simcox, in which courts have declined to find a "grave risk" of harm.  *See* Appellee's Br. at 30 (citing *McManus v. McManus*, 354 F. Supp. 2d 62, 69-70 (D. Mass. 2005) (holding that "two incidents" of a mother striking two of her four children and a generally chaotic home environment was insufficient to establish a grave risk of harm because it did not show "a sustained pattern of physical abuse"); *Whallon v. Lynn*, 230 F.3d 450, 460 (stating that a husband's "verbal abuse and an incident of physical shoving" directed at his wife, while regrettable, was insufficient to establish a "grave risk" of harm to the child, especially where there was no allegation that the father had ever abused the child, either physically or psychologically); *In re D.D.*, 440 F. Supp. 2d 1283, 1299 (M.D. Fla. 2006) (finding "no credible evidence that petitioner has ever physically harmed either of the two children" even though he had been verbally abusive)).  In sum, this case presents difficult, middle-of-the-road facts.  And though it is admittedly a close question, in weighing all of the above factors—the serious nature of the abuse, the extreme frequency with which it occurred, and the reasonable likelihood that it will occur again absent sufficient protection—we conclude that Mrs. Simcox has met her burden of establishing, by clear and convincing evidence, a grave risk of harm in this case.

We are confident that this holding best comports with the purposes for which the Convention was adopted, which was never intended to be used as a vehicle to return children to abusive situations.  *See* Weiner, 33 COLUM. HUMAN RIGHTS L. REV. 275, 278-79 ("The Convention drafters adopted a 'remedy of return' . . . to discourage abductions, reconnect children with their primary caretakers, and locate each custody contest in the forum where most of the relevant evidence existed.  [But] while the remedy of return works well if the abductor is a non-custodial parent, it is inappropriate when the abductor is a primary caretaker who is seeking to protect herself and the children from the other parent's violence.")  Indeed, as the Perez-Vera Report itself recognizes, the Convention's mandate of return "gives way before the primary interest of any person in not being exposed to physical or psychological danger . . . ."  Perez-Vera Report at ¶ 29.  Returning the Simcox children to Mexico, absent sufficient protection, risks exposing them to just such danger.

We cannot say, however, that the risk here is so grave that undertakings must be dismissed out-of-hand.[7]  Indeed, the district court admirably attempted to balance the broad purposes of the Convention with the safety of the children by fashioning undertakings that attempted to protect the children from their father during the pendency of custody proceedings.  Nevertheless, as presently

---

[6] Although the district court expressed "concerns over the validity of [Mrs. Simcox]'s expert conclusions," it recognized that those "opinions were not directly contradicted by [Mr. Simcox]'s expert . . . ."  *Simcox*, 499 F. Supp. 2d 954.  In any event, our analysis does not turn solely on the particular degree of psychological trauma suffered by the children.

[7] This case is thus distinguishable from *Van de Sande*, *Walsh*, *Elyashiv*, and *Rodriguez*, cited *supra*, in that the credited accusations here, while serious, do not reach the level at which we can say, as did those courts, that return would be inappropriate under any circumstances.

constituted, the district court's undertakings are unworkable. The court specifically conditioned return of the children to Mexico on their "remain[ing] in the custody of [Mrs. Simcox] in the family's residence in Rafael Del Gado, Mexico until the Mexican Court hears and determines whether a protective order is appropriate." *Simcox*, 499 F. Supp. 2d at 957. The court further ordered that Mr. Simcox "shall have no contact with [Mrs. Simcox] until the Mexican Court determines access and visitation rights. Upon return to Mexico, [Mrs. Simcox] shall provide [the oldest child, "A. Simcox"] reasonable access to her siblings." *Ibid.*

The problem with these undertakings is two-fold. First, the court ordered Mrs. Simcox *herself*, not just the children, to return to Mexico. Thus, Mrs. Simcox could arguably defeat the order of return by simply refusing to accompany her children to Mexico; since the condition that the children "remain in [her] custody" would be unfulfilled, the children would not be returned. Further litigation would inevitably ensue. Assuming, as we do, that the district court could not compel Mrs. Simcox to return to Mexico, the court must provide for a contingency to assure the children's safety and care should Mrs. Simcox choose to remain in the United States. *See, e.g.*, *Fabri v. Pritikin-Fabri*, 221 F. Supp. 2d 859, 873 (N.D. Ill. 2001) (declining to reach the question of whether the Hague Convention violated the constitutional right to travel because "the court will not order that [respondent] herself return to Italy," only that the child must return, and specifically providing for a contingency if the mother chose not to accompany her daughter to Italy). Second, there may be doubts as to the enforceability of these undertakings. By the district court's analysis, Mr. Simcox has exhibited "an arrogance, a need to be in control and a tendency to act out violently," *Simcox*, 499 F. Supp. 2d at 953; such traits raise questions as to Mr. Simcox's willingness to abide by the court's undertakings, as do his threats to have his wife arrested upon her return to Mexico. However, the latter claim may well be mere bravado, based on Mr. Simcox claiming a power he does not possess.

On remand, we leave it to the district court to determine what undertakings, if any, will be sufficient to ensure the safety of the Simcox children upon their return to Mexico pending the outcome of custody proceedings. Any order on remand should be explicit as to the appropriate and efficacious undertakings that will apply should Mrs. Simcox decline to accompany her children. One possibility may be for Mr. Simcox—who, like Mrs. Simcox, is a U.S. citizen and passport-holder—to remain in the United States and surrender his passport for a period of time. The district court should take into account the possible harm to Mr. Simcox's litigation interest when considering this approach, but we note that, both at trial and at oral argument, Mr. Simcox indicated he was amenable to this option. J.A. 564. If the district court determines that no such arrangement is feasible, or that the only way in which the children may be protected from harm is for them to remain in the custody of their mother, then it may be necessary to deny the petition. We reiterate that the burden for establishing the appropriateness and efficacy of any proposed undertakings rests with the petitioner. *See Danaipour*, 286 F.3d at 21.

## III. Conclusion

For the foregoing reasons, we REVERSE the district court's order and REMAND with instructions to determine what conditions, if any, are appropriate and efficacious to ensure the safety of the children upon their return to Mexico, pending the outcome of custody proceedings.