# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-2663

_____

Ricardo Acosta, also known as Ricardo Acosta Lucchesi

*Petitioner - Appellant*

v.

Anne Marie Acosta; Susan Ellen Campbell; Stephen Alan Campbell

*Respondents - Appellees*

_____

No. 12-2791

_____

Ricardo Acosta, also known as Ricardo Acosta Lucchesi

*Petitioner - Appellee*

v.

Anne Marie Acosta; Susan Ellen Campbell; Stephen Alan Campbell

*Respondents - Appellants*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: March 12, 2013
Filed: August 5, 2013

_____

Before WOLLMAN, BYE, and COLLOTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Ricardo Acosta (Ricardo) filed a petition in Minnesota seeking the return of his children to Peru, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention), *opened for signature* Oct. 25, 1980, T.I.A.S. No. 11670, and its implementing legislation, the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 *et seq*. After a two-day evidentiary hearing, the district court[1] denied Ricardo's petition, finding that although the children's mother, Anne Acosta (Anne), had wrongfully retained the children in the United States, returning the children to Peru would expose them to a grave risk of harm. Ricardo appeals, arguing that the district court erred in determining that returning the children would expose them to a grave risk of harm, abused its discretion by admitting certain expert testimony, and erred by dismissing his claim against Anne's parents, Susan and Stephen Campbell (Susan and Stephen). Anne cross-appeals, arguing that the district court erred in denying one of her affirmative defenses. We affirm the district court's decision and dismiss Anne's cross-appeal as moot.

I. Background

Ricardo challenges the district court's credibility determinations but does not otherwise dispute its findings of fact. Because its credibility determinations are not clearly erroneous, we draw the following facts from the district court's findings. See Fed. R. Civ. P. 52(a); Schaub v. VonWald, 638 F.3d 905, 915 (8th Cir. 2011) ("When

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

findings are based on witness credibility, Rule 52(a) demands even greater deference to the trial court's findings.").

Ricardo, a Peruvian citizen, married Anne, a United States citizen, in Minnesota in November 2002. After their wedding, the couple made their home in the United States. Anne gave birth to the couple's first child, M.A.A., in February 2003. In the summer of 2006, the Acostas moved to Lima, Peru, where Anne began working at el Colegio de Franklin Delano Roosevelt (the Roosevelt School). Anne gave birth to the couple's second child, E.T.A., in August 2007.

During their marriage, Ricardo verbally abused Anne in the children's presence. He told her that she looked like a "hippopotamus" and called her a "fucking bitch." He also lost his temper and became violent. On one occasion, Ricardo became angry with M.A.A. for talking back and pushed him down onto a bed. On another occasion in 2008 or 2009, Ricardo was driving with Anne and the children when a taxi cut them off. Ricardo forced the taxi to a stop, struck the taxi driver, and shattered the taxi's windshield with a theft-deterrent tool used to lock the family car's steering wheel.

While living in Peru, M.A.A. attended the Roosevelt School. Rachael Metcalf Harrington, the principal at the Roosevelt School, testified that M.A.A. exhibited significant behavior problems, including telling his teachers that he wanted to kill himself. Harrington testified that M.A.A.'s behavior problems were the third most severe she had seen in her nineteen years of teaching. M.A.A. was referred to therapy but ceased attending after only two or three sessions because Ricardo felt that the family could not afford it and believed, based on his own experiences, that therapy was ineffective.

By late 2010, the couple's relationship had deteriorated. They were seeing a counselor and sleeping in separate rooms. Anne testified that she was afraid of

Ricardo and unhappy in her marriage. In November 2010, the couple agreed that Anne and the children would go to Minnesota to be with Anne's family over the holidays. Anne's parents urged Ricardo to join the family for the holidays, but he remained in Peru. Anne and the children left on December 23, 2010, and were scheduled to return to Peru on February 16, 2011. Once the children were in Minnesota, Anne, Stephen, and Susan prevented Ricardo from speaking with the children on the telephone. Stephen noticed that M.A.A. had violent outbursts, wet his bed at night, and said he wished he were dead. Stephen testified that M.A.A. has since enrolled in therapy and that his behavior has improved.

By early February 2011, Anne had told Ricardo that she wanted a divorce and that she and the children would not be returning to Peru. Anne and her brother, Jeffrey Campbell (Jeffrey), traveled to Peru on February 11, 2011, to gather her and the children's belongings from the apartment she and Ricardo had shared. Anne and Jeffrey asked two of Anne's coworkers—Elizabeth Norton LeBoo and Jacob Johansen[2]—to accompany them. Anne, Jeffrey, LeBoo, and Johansen arrived at the apartment on February 13, 2011.

Anne called Ricardo from the apartment and told him that she was packing her things. Ricardo reacted badly, telling Anne and Jeffrey that he loved his family and that he was going to kill himself. Ricardo thereafter arrived at the apartment building in a rage, crashing his car into a pole and smashing a window of the taxi waiting for Anne and the others. To prevent Ricardo from entering the apartment, Jeffrey and Johansen tried to hold the apartment door shut. Ricardo kicked it to pieces and forced his way inside.

---

[2]This party's name is spelled "Johanssen" in the evidentiary hearing transcript and "Johansen" in the district court's findings of fact and conclusions of law. For consistency, we will use "Johansen."

After entering the apartment, Ricardo began throwing items at Anne. Thereafter, he grabbed a knife from the kitchen and chased the men while Anne and LeBoo retreated to a back room. Ricardo chased Johansen outside, where he cut Johansen's leg with the knife. Ricardo returned to the apartment, where he brandished the knife towards Jeffrey, who had backed into a corner. Jeffrey testified that he had begged for his life, believing Ricardo was going to kill him. Jeffrey described Ricardo's appearance as looking like "an enraged doppelganger." Returning his focus to Anne, Ricardo forced his way into the room where she and LeBoo had hidden. Ricardo then first battered LeBoo and then Anne, notwithstanding the arrival of the police, who stood passively by until finally taking action to restrain Ricardo.

Following the melee, Anne and her companions took an ambulance to a hospital, where she and Johansen received stitches for the injuries they had suffered at Ricardo's hands. The district court found that in the midst of the melee Ricardo had placed a cell phone call to Susan, in which "[i]n a profanity-laced tirade, he threatened to kill Susan Campbell, Stephen Campbell, Jeffrey Campbell, Anne, and Anne's sister." D. Ct. Order of June 14, 2012, at 9. That evening, Ricardo called Harrington and said that he was going to come to the Roosevelt School and kill Anne with a knife. The following day, Ricardo or someone acting at his direction attempted to gain access to LeBoo's residence.

Anne returned to the United States on February 15, 2011. In the weeks following the altercation at the apartment, Ricardo called Stephen and Susan numerous times, leaving threatening voicemails, in one of which he stated, "I'll kill your kids because she's taking my babies away. And, I promise you, your daughter is going to be killed because she is taking my kids away." In a live conversation with Susan, Ricardo threatened to kill M.A.A., E.T.A., and himself.

Shortly after returning from Peru, Anne met with officers from the Ramsey County Sheriff's Department, following which a warrant was issued for Ricardo's arrest. In early March 2011, Ricardo initiated a custody action for the children in Peru. On March 10, 2011, Anne filed a petition for dissolution of marriage in Minnesota, in which she sought custody of the children. Anne's petition was eventually dismissed for lack of jurisdiction. In May 2011, Ricardo traveled to Miami, Florida, where he was arrested on the Minnesota warrant. Ricardo was then extradited to Minnesota, where he pleaded guilty to making terroristic threats in violation of Minnesota Statutes § 609.713. Ricardo returned to Peru to serve his probation. Ricardo was allowed to visit with his children via video conference, which he did on only one occasion.

Ricardo filed this action in February 2012. Stephen and Susan moved to dismiss Ricardo's claim against them under Federal Rule of Civil Procedure 12(b)(6). Anne answered the petition, asserting several affirmative defenses under the Hague Convention, including that returning the children to Peru would expose them to a grave risk of harm, see Hague Convention art. 13b, and would violate the fundamental principles of the United States relating to the protection of human rights and fundamental freedoms, see Hague Convention art. 20.

During the evidentiary hearing on these matters, the district court heard testimony from several witnesses, including Ricardo, Anne, Stephen, Jeffrey, Susan, LeBoo, and Harrington. The district court also heard testimony from Dr. Jeffrey Edleson, who was then a professor at the School of Social Work at the University of Minnesota and who was the founding director of the Minnesota Center Against Violence and Abuse. Over Ricardo's objection, Dr. Edleson testified that several factors indicated that returning the children to Peru would expose them to a high risk of harm. Specifically, Dr. Edleson cited: 1) Ricardo's history of violence; 2) the escalating severity of Ricardo's violent acts, including his assault of Anne in the presence of others on February 13, 2011; 3) Ricardo's threats to kill Anne and her

family, including E.T.A. and M.A.A.; 4) Ricardo's threat to commit suicide; and 5) Ricardo's estrangement from Anne. Dr. Edleson also testified that M.A.A.'s behavioral problems were consistent with exposure to domestic violence and that he believed M.A.A. to be exhibiting signs of depression.

At the close of evidence and after hearing arguments from both parties, the district court granted Stephen and Susan's motion to dismiss, found that the children had been wrongfully retained in the United States, and ruled that Anne had failed to prove her Article 20 affirmative defense by clear and convincing evidence. In its subsequent findings of fact and conclusions of law, however, the district court found that the children would face a grave risk of physical and psychological harm if they were returned to Peru, and it thus denied Ricardo's petition.

## II. Discussion

A determination of a grave risk of harm under the Hague Convention is a mixed question of law and fact that we review *de novo*. Silverman v. Silverman, 338 F.3d 886, 896 (8th Cir. 2003) (en banc). "We review the district court's decision to admit expert testimony for abuse of discretion, giving substantial deference to the district court." David E. Watson, P.C. v. United States, 668 F.3d 1008, 1014 (8th Cir. 2012).

## A. Dr. Edleson's Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge

will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Ricardo argues that the district court abused its discretion in admitting Dr. Edleson's testimony because the testimony was uncorroborated and generic in nature and because it relied on facts in controversy. We interpret this argument as a challenge to the factual basis of Dr. Edleson's testimony. Generally, however, such a challenge goes to the credibility of the expert testimony, rather than its admissibility. Minn. Supply Co. v. Raymond Corp., 472 F.3d 524, 544 (8th Cir. 2006). "[I]t is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Id. (quoting Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 865 (8th Cir. 2004)).

The factual basis for Dr. Edleson's testimony was sufficient. In preparation for his court appearance, Dr. Edleson interviewed Anne and M.A.A. and reviewed a myriad of documents and evidence, including the following: treatment summaries from M.A.A.'s therapist, summaries of Ricardo's supervised visitation with the children, notes from school teachers about the children's behavior, various court filings, and the threatening voice messages Ricardo left for Susan. As to Ricardo's concern that Dr. Edleson's opinions reflect only Anne's side of the story, Dr. Edleson clearly stated the factual basis for his opinions and was subjected to cross-examination on this issue. Ricardo has failed to identify any specific facts that he believes are uncorroborated, and the factual basis for Dr. Edleson's opinions finds ample support in the testimony of Anne, Jeffrey, Susan, Stephen, Harrington, and LeBoo. Finally, Dr. Edleson's testimony was not generic; he applied his expertise to

the specific facts of this case when he opined that several factors indicated that returning the children to Peru would subject them to a high risk of harm. Accordingly, the district court did not abuse its discretion by admitting the testimony.[3]

## B. The Hague Convention and the Article 13b Exception

The Hague Convention, to which the United States and Peru are contracting states, "generally requires courts in the United States to order children returned to their countries of habitual residence, if the courts find that the children have been wrongfully removed to or retained in the United States." Chafin v. Chafin, 133 S. Ct. 1017, 1021 (2013). The Hague Convention is not designed to resolve underlying custody disputes, 42 U.S.C. § 11601(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims."); Hague Convention art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."), but rather to ensure that such disputes are adjudicated in the appropriate jurisdiction, Barzilay v. Barzilay, 600 F.3d 912, 916-17 (8th Cir. 2010). Its "primary purpose is to restore the status quo and deter parents from crossing international borders in search of a more sympathetic court." Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 376 (8th Cir. 1995).

Article 13b provides a narrow exception to the Hague Convention's general rule of return. Hague Convention art. 13b; see also Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir. 1995) (explaining that exceptions to the Hague Convention should be

---

[3]In Vasquez v. Colores, 648 F.3d 648, 653 (8th Cir. 2011), we held that the district court did not abuse its discretion by excluding as irrelevant testimony from Dr. Edleson. In Vasquez, however, the proponent of the evidence did not contend that Dr. Edleson had formed an opinion concerning the child. Id.

construed narrowly). Article 13b does not require return if a respondent establishes by "clear and convincing evidence[,]" 42 U.S.C. § 11603(e)(2)(A), that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation[,]" Hague Convention art. 13b. General evidence of harm is insufficient to satisfy Article 13b. Nunez-Escudero, 58 F.3d at 376.

A grave risk of harm may exist in cases involving "serious abuse or neglect." Vasquez v. Colores, 648 F.3d 648, 650 (8th Cir. 2011). Ricardo argues that the facts of this case do not support a finding of a grave risk of harm and that the district court abused its discretion by failing to order "undertakings."

### 1. Grave Risk of Harm to M.A.A. and E.T.A.

The district court found that Ricardo's violent temper and inability to cope with the prospect of losing custody of the children would expose the children to a grave risk of harm were they returned to Peru. It found that "it is highly probable that Ricardo will react with violence, threats, or other verbal abuse towards the children, Anne, or others." D. Ct. Order of June 14, 2012, at 18. Ricardo contends that this finding was erroneous because the majority of his violent conduct was in response to Anne's abduction of the children. Although we do not condone Anne's decision to retain the children in Minnesota without Ricardo's consent, her conduct in doing so does not preclude us from considering Ricardo's violent response at the apartment. Ricardo's rage continued unabated for at least a week after the altercation, during which he made multiple threats to kill Anne and her family. Ricardo's characterization of his response as unprecedented and situational is not convincing. Ricardo's violent behavior when cut off by a taxi demonstrates his inability to control his temper in circumstances much less provocative than those that existed during the incident at the apartment.

Although there is little evidence that Ricardo physically abused the children, the lack of such evidence does not necessarily render Article 13b inapplicable. See Baran v. Beaty, 526 F.3d 1340, 1346 (11th Cir. 2008) (despite the absence of evidence showing that the father abused the child in the past, the father's alcohol abuse, violent temper, abuse of the mother in the child's presence, and threats to hurt the child justified a finding of a grave risk of harm). The proper focus under Article 13b is whether returning the children to Peru would expose them to a grave risk of harm. Id. The evidence presented to the district court supports its finding that Ricardo's inability to control his temper outbursts presents a significant danger that he will act irrationally towards himself and his children. Ricardo's assault of the taxi driver in his children's presence, his verbal abuse of Anne in their presence, and his shoving of M.A.A. demonstrate that Ricardo is either unwilling or unable to shield the children from his rage. His telephonically expressed threats to kill the children and then himself are further evidence of his extremely unstable nature. And here it must be mentioned that a written description of those telephone calls does not begin to convey the chilling intensity of Ricardo's rage that the recorded calls themselves communicate. Given Ricardo's violent temper and his disregard for protecting the children from its consequences, "it would be irresponsible to think the risk to the children less than grave." Van De Sande v. Van De Sande, 431 F.3d 567, 570 (7th Cir. 2005).

Ricardo also argues that finding a grave risk of harm based on the above-described facts will allow courts to refuse to return a child whenever there is any indication of domestic violence, no matter how slight. We disagree. "The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes." Id. The probability that Ricardo will lose his temper and harm the children should they be returned to Peru for a custody determination is high, for as the district court found, "The evidence shows that Ricardo does not have the emotional fortitude to acknowledge custody of his children may ultimately be with Anne." D. Ct. Order of June 14, 2012, at 16. Ricardo's testimony and voice

-11-

messages indicate that he wants the children returned to his care. A Peruvian court's order to the contrary likely could cause Ricardo to become violent and harm the children. Dr. Edleson's testimony that there is a high risk that Ricardo would abuse the children in the future, including the possibility of homicide, further supports this determination. These facts distinguish this case from those in which courts have declined to find a grave risk of harm. See Altamiranda Vale v. Avila, 538 F.3d 581, 587 (7th Cir. 2008) (affirming district court's rejection of grave risk exception where evidence consisted of a contested assertion that father once struck his son with a video-game cord); Whallon v. Lynn, 230 F.3d 450, 460 (1st Cir. 2000) (mother's allegation that father had verbally abused her and shoved her on one occasion was insufficient to establish a grave risk of harm, particularly where there was no evidence that father had ever harmed child).

## 2. Undertakings

Once a district court concludes that returning a child to his or her country of habitual residence would expose the child to a grave risk of harm, it has the discretion to refuse to do so. See Hague Convention art. 13 (explaining that a court is "not bound to order the return of the child" if the exception applies). Ricardo argues that the district court abused this discretion when it declined to return the children to Peru because "undertakings," or conditions on the children's return, would ameliorate any risk of harm. "A potential grave risk of harm can, at times, be mitigated sufficiently by the acceptance of undertakings and sufficient guarantees of performance of those undertakings." Walsh v. Walsh, 221 F.3d 204, 219 (1st Cir. 2000). When a grave risk of harm to a child exists as a result of a violent parent, however, courts have been reluctant to rely on undertakings to protect the child. See Simcox v. Simcox, 511 F.3d 594, 606 (6th Cir. 2007) ("[C]ourts . . . have viewed undertakings much more skeptically in cases involving an abusive spouse."); Van De Sande, 431 F.3d at 572 ("[I]n cases of child abuse the balance may shift against [undertakings]."). As the

-12-

petitioner proffering the undertaking, Ricardo bears the burden of proof. Simcox, 511 F.3d at 606.

Ricardo did not make a specific proposal for appropriate undertakings before the district court. On appeal, he asserts that the district court could have ordered the parties to utilize certain services available in Peru, which, according to his Peruvian attorney, include a child's ability to inform his school if he is suffering abuse, protection orders, battered women's shelters, and a domestic abuse hotline. That Peru has services designed to address domestic violence does not, by itself, establish that the children would receive sufficient protection if returned. See Van De Sande, 431 F.3d at 571 ("The rendering court must satisfy itself that the children will in fact, and not just in legal theory, be protected if returned to their abuser's custody."). Moreover, Ricardo's attack on Anne and LeBoo in the presence of the police indicates that any undertaking ordered by a foreign court might well not deter him from engaging in violence towards the children or others if confronted with a temper-igniting situation. Given these circumstances, the district court did not abuse its discretion in declining to return the children to Peru.[4]

III. Conclusion

The judgment is affirmed. The cross-appeal is dismissed as moot.

_____

[4]In his petition, Ricardo asserted that Susan and Stephen were liable for legal fees and costs under 42 U.S.C. § 11607 because they aided and abetted Anne's abduction of the children. Because an award of legal fees and costs under § 11607(b)(3) is appropriate only when a court orders the return of a child, we necessarily reject Ricardo's argument that the district court erred by dismissing his claim against Susan and Stephen.