Thomas KANE, Plaintiff,

v.

Dr. Katherine LITOW, Dr. Dan Hinshaw, James Roseborough, Paul Scheel, Dr. Alan Mellow, and Dr. Sri Mahapatra, Defendants.

No. 00–74785.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 24, 2002.

Thomas Kane, Detroit, MI, pro se.

Paul A. Wright, Oakland, MI, for Thomas Kane.

Geneva S. Halliday, U.S. Atty's Office, Detroit, MI, for Defendants.

### *OPINION AND ORDER*

ZATKOFF, Chief Judge.

## I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment. Plaintiff responded. The Court finds that the parties have adequately set forth the relevant law and facts and oral argument would not aid in the disposition of the instant motion. *See* E.D. MICH. L.R. 7.1(e)(2). Accordingly, the Court ORDERS that the motion be decided on the briefs submitted. For the reasons set forth below, Defendants' Motion for Summary Judgment is GRANTED.

## II. BACKGROUND

Plaintiff, Thomas Kane, filed a complaint on October 30, 2000, alleging that Defendants, six employees at the Veteran's Administration Hospital (hereinafter "VA Hospital") in Ann Arbor, Michigan, deprived him of a number of his constitutional rights. Primarily, Plaintiff alleges that Defendants retaliated against him for exercising his right to free speech by having him committed to the psychiatric ward of the VA Hospital for a week.

Plaintiff has a long history of hospitalization stemming from his post-traumatic stress disorder (hereinafter "PTSD"). In 1989, he was hospitalized in Virginia for "treatment of depression and evaluation of suicidal risk." In 1996, he was hospitalized after he fell off the porch of his house; while at the hospital, he was diagnosed with PTSD, and the treating doctors thought he was, in Plaintiff's words, "mentally screwed up." In 1997, he was again hospitalized for depression and suicidal ideation. Finally, Plaintiff was hospitalized in November 1998, reportedly because he was "in need of immediate hospitalization to prevent harm to self and to others." Plaintiff's chief claim arises out of his 1998 hospitalization.

Plaintiff has been a patient at the VA Hospital from 1993 until present, being treated for PTSD and depression. Defendant Dr. Katherine Litow attended to Plaintiff from May 29, 1997 until December 9, 1998. On November 2, 1998, Dr. Litow met with Plaintiff and noted that Plaintiff was severely depressed. While Dr. Litow noted that he was not an acute danger to himself or others at that time, she wanted to closely monitor Plaintiff. To that end, she set up an appointment with him for the next day. Plaintiff returned November 3, 1998, and Dr. Litow noted that he was "very angry, sad, and feeling hopeless about self and future." Plaintiff alluded to plans to "pay back" the administration and that after he has "taken care of the bastards," he would kill

himself. Dr. Litow determined that Plaintiff had become an acute danger to himself and others, and asked Plaintiff to come stay at the hospital voluntarily; after initial hesitance, Plaintiff agreed to informal voluntary hospitalization. Plaintiff was turned over to the care of Defendant Dr. Sri Mahapatra, who was the Chief of the Inpatient Psychiatric Unit. Dr. Litow discussed Plaintiff's condition with Dr. Mahapatra, and determined that Plaintiff required continual assessment.

Because Plaintiff was admitted voluntarily, a commitment proceeding was not necessary, however if Plaintiff decided he wanted to leave, Dr. Litow was prepared to have commitment proceedings initiated. To that end, Dr. Litow prepared a petition for commitment on November 6, 1998, in case it became necessary. In it, she wrote, "[Plaintiff] [s]tated that he would 'pay back' administrators here so they couldn't do to others what had been done to him, and that he would kill himself also to end his suffering."

On November 6, 1998, in the presence of Dr. Mahapatra, a social worker, and the VA Hospital Chaplin, Plaintiff signed a formal voluntary admission form. That form states that, in compliance with MICH. COMP. LAWS § 330.1419, the VA Hospital had the right to prevent Plaintiff from leaving the VA Hospital voluntarily for up to three days after the day he requested to be discharged, not counting Sundays. Later in the day on November 6, 1998, Plaintiff requested to leave the VA Hospital. Because the VA Hospital had the right to prevent him from leaving for three days after his request, not counting Sundays, the VA Hospital did not allow him to leave until November 10, 1998. At that time, Plaintiff was released from the VA Hospital.

On November 10, 1998, Plaintiff had a meeting with Dr. Litow. In that meeting, he admitted that he made threatening statements, but he explained that he was "venting," and that he did not mean anyone harm. Further, he stated he was upset with Dr. Litow for not understanding that Plaintiff did not mean anyone harm. In a follow-up visit on November 16, 1998, Plaintiff was much less angry than he was in early November. He was able to discuss some of his feelings, such as his guilt about having survived when his peers did not, and stated that he is "only feeling alive when I'm fighting."

A week later, on November 23, 1998, the Joint Commission on Accreditation of Healthcare Organizations (hereinafter "JCAHO") visited the VA Hospital in Ann Arbor. On May 18, 1998, the VA Hospital was notified that it had received a three-year accreditation from the JCAHO; at that time, the JCAHO indicated that it would return six months later, on November 23, 1998, to evaluate the implementation of certain improvements that the JCAHO found necessary. Plaintiff wanted to, and did, appear before the JCAHO during their November 23, 1998 visit in order to inform it of certain VA Hospital practices that Plaintiff protested.

Plaintiff had many complaints about the care the VA Hospital provided, especially the care given to the PTSD patients. Plaintiff wrote an open letter, dated June 26, 1998, and signed "Citizen Kane," complaining about the reduction in the number of beds in the VA Hospital and the overall move towards outpatient care at the VA Hospital. Plaintiff's letter points out several problems that this has led to, including, he alleges, causing a veteran to commit suicide. Plaintiff alleges that this letter, along with a request to seek treatment at a VA facility in Hawaii, caused Defendants to conspire in retaliation against him by having him committed on November 3, 1998.

Plaintiff alleges in his brief that Defendants conspired against him during a number of clandestine meetings. Plaintiff alleges that the conspiracy began when, in June 1998, Plaintiff delivered a handwritten copy of the "Citizen Kane" letter to Dr. Litow. This letter was given to the Chief of Psychiatry, Defendant Dr. Alan Mellow. In turn, Dr. Mellow presented the letter to Mr. Roseborough, the Director of the Hospital. Thus, Plaintiff alleges that the Director of the Hospital had knowledge of who wrote the "Citizen Kane" letter. It was at this point, Plaintiff alleges, that Defendants became concerned about Plaintiff's activities.

Plaintiff further alleges that he showed Dr. Litow a typed copy of his "Citizen Kane" letter on November 2, 1998, to inform her that he was on his way to showing the letter to Dr. Litow's supervisor, Dr. Dan Hinshaw. Plaintiff alleges that Defendants decided that afternoon that Plaintiff would be "hospitalized" the following day. According to Plaintiff, Defendants wrongfully hospitalized him the following day, and engaged in a large cover-up operation.

One difficulty with the alleged facts is that Plaintiff's brief is contradicted by Plaintiff's amended complaint, as well as Plaintiff's own admission, with regards to the handwritten version of the "Citizen Kane" letter. Again, Plaintiff states in his brief, which is supported by his own affidavit, that he gave the handwritten copy of the letter to Dr. Litow in June 1998. According to Plaintiff's amended complaint, however, the handwritten letter was not received by Dr. Litow, but by Mr. Roseborough instead. Nor does Plaintiff state in his complaint that he delivered the letter to either Mr. Roseborough or Dr. Litow; instead, there is a strong implication that Plaintiff does not know how the handwritten "Citizen Kane" letter ended up in Mr. Roseborough's possession. Further,

Plaintiff testified in his deposition that he did not know how Mr. Roseborough came to possess the handwritten copy of the letter.

None of the Defendants knew who wrote the handwritten verison of the "Citizen Kane" letter. More to the point, neither Mr. Roseborough, nor Dr. Mellow, nor any other Defendant in this case associated Plaintiff with the letter. Furthermore, aside from Dr. Litow, none of the Defendants knew that Plaintiff wanted to appear before the JCAHO on November 23, 1998 until after he was hospitalized.

After his hospitalization, Plaintiff resumed treatment with Dr. Litow. Plaintiff was scheduled to meet with Dr. Litow on December 9, 1998, in the morning. Plaintiff missed that meeting, but appeared in the afternoon to schedule a new appointment. Dr. Litow asked why Plaintiff missed the morning session, to which Plaintiff replied that he had been "in Flint, with the congressman. . . . I'm making you a star." A moment later, Plaintiff talked of stars "getting shot," and then said, "maybe that's your fate." Dr. Litow contacted the Committee for the Prevention and Management of Disturbed Behavior (hereinafter "CPMDB"), and reported the incident. In turn, the CPMDB reported the incident to the VA Police. On December 12, 1998, the VA police were notified that Plaintiff was in the social worker's office. The VA police confronted Plaintiff, and accompanied him to the VA Hospital police office. There, they asked him about his comment to Dr. Litow regarding stars "getting shot," and was advised that his file was being forwarded to the F.B.I. Plaintiff states in his deposition that he was released after he was questioned, and heard nothing more on the matter. Plaintiff, however, alleges that he never made the statement about stars "getting shot;" rather, he alleges, Dr. Litow falsely attrib-

uted that statement to him in an attempt to intimidate Plaintiff.

After that incident, Plaintiff went to Hawaii to be treated at the Pacific Center for PTSD, which is also operated by the Veteran's Administration. After being discharged from that program early for being "non-compliant with his treatment plan," Plaintiff returned to the VA Hospital in Ann Arbor to seek treatment. On April 2, 1999, VA Hospital Chaplain Roland Schaedig and Dr. Ken Chamberlain, neither of whom are named defendants, wrote a letter to Plaintiff informing him that, due to difficulties that the VA Hospital has had with him in the past, Plaintiff would need to agree to a treatment plan before treatment was recommenced. The letter states that the VA Hospital was glad to work with Plaintiff in order to find a mutually acceptable treatment plan. Plaintiff, however, took this letter to mean that he was no longer allowed to be treated at the Ann Arbor VA Hospital.

On January 4, 2000, Plaintiff entered the VA Hospital's Volunteer Office. He told the attendant that he was no longer able to attend treatment programs at the VA Hospital. Further, he told the attendant that she should "watch for what would happen on February 10, 2000" and alluded that it would be a significant date for the VA Hospital. His statement was vague, but he also told the attendant that she should watch how "these people react." He stated that he had been a paratrooper, and that paratroopers "only handled things one way." The attendant that Plaintiff spoke with described the conversation in a letter, which was given to the secretary of the VA Hospital's director. Plaintiff alleges that this letter is evidence that Defendants are still conspiring to deny him treatment at the VA Hospital. Thus, in addition to his claim for the wrongful hospitalization, Plaintiff makes two other claims: first, he was wrongfully detained by VA Hospital security officers in December 1998; and second, he was, and still is, wrongfully denied care at the VA Hospital in Ann Arbor.

## III. LEGAL STANDARD

Summary judgment is appropriate only if the answers to interrogatories, depositions, admissions, and pleadings combined with the affidavits in support show that no genuine issue as to any material fact remains and the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If, however, the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The non-moving party must do

more than show that there is some abstract doubt as to the material facts; rather, it must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.1993).

## IV. ANALYSIS

■ Plaintiff alleges a violation of a number of his constitutional protections. A government official may be held civilly liable for violating a person's constitutional rights. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Subjecting government officials to personal liability, however, can distract them from their work and inhibit them in their discretionary action; thus, the right to sue government officials is limited. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Government officials, such as the Defendants in this case, are generally immune from liability for performing discretionary functions. *See id.* at 818, 102 S.Ct. 2727. This limitation is better known as qualified immunity. In order to overcome qualified immunity, Plaintiff must show that the government official violated one of his constitutional rights, and that Plaintiff's constitutional right was clearly established. *See Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2155–56, 150 L.Ed.2d 272 (2001). The Court now examines whether Plaintiff has overcome Defendants' qualified immunity.

■ Plaintiff alleges that he was "locked up" in violation of the First Amendment because Defendants attempted to prevent him from voicing his opinion about the unacceptable care that the VA Hospital provides. Taking all the evidence in the light most favorable to Plaintiff, he cannot show that he was hospitalized in November 1998 for any reason other being an acute danger to self and others. Plaintiff presents no evidence to support this position other than his own self-serving affidavit and deposition testimony.

As pointed out above, his deposition testimony contradicts his affidavit on at least one key issue. Plaintiff's predicate for stating that there was a conspiracy is that he gave the handwritten copy of the "Citizen Kane" letter to Dr. Litow, who in turn gave it to her superior, Dr. Mellow, who then gave it to Mr. Roseborough, the VA Hospital's Director; because of this, Plaintiff alleges Defendants knew who wrote the letter, and whom they should conspire against. But, as also mentioned, Plaintiff stated in his deposition that he did not know how Mr. Roseborough came to possess the letter. If Defendants did not know the author of the handwritten copy of the "Citizen Kane" letter, then Defendants would not have been able to conspire against Plaintiff. Thus, Plaintiff's only evidence as to the predicate for the conspiracy is contradicted by his own deposition testimony. Further, none of the Defendants knew who the author of the handwritten "Citizen Kane" letter was before his hospitalization on November 3, 1998. Finally, Dr. Litow was solely responsible for the decision to have Plaintiff hospitalized on November 3, 1998. Therefore, Plaintiff does not overcome Defendants' qualified immunity on First Amendment grounds.

■ Plaintiff additionally claims that Defendants: 1) unreasonably seized him in violation of the Fourth Amendment; 2) deprived him of his liberty without due process in violation of the Fifth Amendment; and 3) deprived him of his right to a jury or to the assistance of counsel in violation of the Sixth Amendment. These claims are all based on the following: Plaintiff claims that Dr. Litow and Dr. Mahapatra did not follow the proper pro-

cedures in having him committed. Plaintiff states that he did not consent to being informally hospitalized; therefore, he was hospitalized involuntarily. Under Michigan law, which is incorporated by the Veteran's Administration, involuntary hospitalization requires a court proceeding, *see* MICH. COMP. LAWS § 330.1401 *et seq.*, which did not occur in this case. Thus, Plaintiff concludes that his constitutional rights were violated.

Plaintiff again does not overcome Defendants' qualified immunity. Dr. Litow stated in her affidavit that Plaintiff consented to informal voluntary hospitalization after his initial hesitance. Both Dr. Litow and Dr. Mahapatra were well aware of the requirements necessary for hospitalizing an individual without his or her consent, and to that end, Dr. Litow prepared an appropriate petition. Defendants, however, did not find it to be necessary to commence a formal involuntary proceeding because of his consent. In addition, on November 6, 1998, Plaintiff signed a form consenting to formal voluntary hospitalization, a copy of which was produced in discovery. Therefore, the Court finds that Plaintiff does not overcome Defendants' qualified immunity with regards to either the Fourth, Fifth, or Sixth Amendment.

Plaintiff also claims that Defendants inflicted cruel and unusual punishment upon him in violation of the Eighth Amendment. Plaintiff's complaint is not a model of clarity, and it is unclear from his complaint which alleged facts underlie this claim; from what the Court can determine, however, Plaintiff's Eighth Amendment claim arises out of his allegation that he was, and is still, denied care at the VA Hospital in Ann Arbor as punishment. But, it is plain from the letter submitted to the Court that he simply was not denied treatment; the VA Hospital staff wanted him to agree to the treatment he would receive before recommencing treatment.

Finally, Plaintiff argues that he was wrongfully threatened by the VA police following the December 9, 1998 comment to Dr. Litow about stars "getting shot." He fails, however, to demonstrate to the Court how merely being escorted by the VA police from the social worker's office to the police office, which was on the same floor, and being asked a few questions about a reported incident violates any of his constitutional rights sufficient to overcome qualified immunity.

## V. CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment is GRANTED.[1]

IT IS SO ORDERED.

---

**1.** Plaintiff's counsel made a Motion to Withdraw on January 15, 2002. Because Plaintiff's complaint is dismissed, this motion is DENIED as moot.